**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**EASTERN DIVISION**

| | |
|---|---|
| **DEBRA STRENGBERG,** | Case No. EDCV 14-2623 AJW |
| Plaintiff, | |
| v. | |
| **CAROLYN W. COLVIN,** Acting Commissioner of Social Security, | **MEMORANDUM OF DECISION AND ORDER** |
| Defendant. | |

Plaintiff filed this action seeking reversal of the decision of defendant, the Commissioner of the Social Security Administration (the "Commissioner"), denying plaintiff's application for disability insurance benefits. The parties have filed a Joint Stipulation ("JS") setting forth their contentions with respect to each disputed issue.

**Administrative Proceedings**

The parties are familiar with the procedural facts. [See JS 1-2]. Plaintiff alleged onset of disability in September 2008. In a written hearing decision that constitutes the Commissioner's final decision in this matter, the ALJ found that plaintiff had severe impairments consisting of a cervical spine disorder, "presumptive fibromyalgia," mild bilateral carpal tunnel syndrome; and a history of headaches. [AR 17]. The ALJ determined that plaintiff retained the residual functional capacity ("RFC") to perform a restricted range of light work, and that her RFC did not preclude plaintiff from performing her past relevant work. Therefore, the ALJ concluded that plaintiff was not disabled at

1  any time through the date of her decision. [JS 1-2; Administrative Record ("AR") 14-23].[1]

## Standard of Review

The Commissioner's denial of benefits should be disturbed only if it is not supported by substantial evidence or is based on legal error. Stout v. Comm'r, Social Sec. Admin., 454 F.3d 1050, 1054 (9th Cir. 2006); Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002). "Substantial evidence" means "more than a mere scintilla, but less than a preponderance." Bayliss v. Barnhart, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005). "It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) (internal quotation marks omitted). The court is required to review the record as a whole and to consider evidence detracting from the decision as well as evidence supporting the decision. Robbins v. Social Sec. Admin, 466 F.3d 880, 882 (9th Cir. 2006); Verduzco v. Apfel, 188 F.3d 1087, 1089 (9th Cir. 1999). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." Thomas, 278 F.3d at 954 (citing Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 599 (9th Cir. 1999)).

## Discussion

Plaintiff contends that the ALJ erred in improperly rejecting the opinions of plaintiff's treating physicians, Douglas Starr, M.D., and Shirley Pang, M.D. [JS 20-28].

Plaintiff began receiving treatment at St. Jude Heritage Medical Group ("St. Jude") in 2004; both Dr. Starr and Dr. Pang were affiliated with St. Jude. Dr. Starr was plaintiff's primary care treating physician beginning no later than 2007, and Dr. Pang was her treating rheumatologist beginning in November 2008. [AR 405, 462-463]. Plaintiff's medical records indicate that she received coordinated care at through St. Jude from Dr. Starr, Dr. Pang, and other providers and specialists. [See AR 366-865, 876-1588]. For example, Dr. Starr referred plaintiff to a St. Jude spine specialist, William Ko, M.D., who in turn referred plaintiff for a neurologic consultation with Jack Florin, M.D. at the Fullerton Neurology and Headache Center, where plaintiff eventually received

---

[1] The same ALJ issued a prior adverse decision that was vacated by the Appeals Council, which remanded the matter for further administrative proceedings and a new hearing decision. [See AR 90-97, 102-106].

- 2 -

treatment for migraine headaches and fibromyalgia. [AR 356-377, 1392-1404].

Drs. Starr and Pang each completed written physical RFC assessments in November 2010 and again in February 2013. [AR 1226-1240, 1561-1573]. In her hearing decision, the ALJ discussed Dr. Starr's opinions and Dr. Pang's February 2013 opinion but did not mention Dr. Pang's November 2010 opinion. As the ALJ acknowledged, Dr. Starr and Dr. Pang provided similar assessments. [AR 21]. They both opined that plaintiff had chronic, severe pain and what amount to disabling work-related functional limitations, with a poor or "fair-poor" prognosis. Dr. Pang diagnosed migraine headaches and fibromyalgia; Dr. Starr diagnosed migraine headaches, fibromyalgia, osteoarthritis, cervical spondylosis, and chronic pain syndrome. Both doctors agreed that plaintiff met the American Rheumatological criteria for fibromyalgia.[2] [AR 1234, 1226, 1561, 1567]. Both physicians agreed that plaintiff's signs and symptoms included multiple tender points, nonrestorative or impaired sleep, chronic fatigue, muscle spasm, muscle weakness, frequent severe headaches, and depression. [AR 1226-1228, 1234-1235, 1562-1563, 1567-1568]. Both physicians pointed to clinical findings of diffuse allodynia (central pain sensitization to stimuli that ordinarily do not cause pain) and 18 out of 18 fibromyalgia trigger points. [AR 1226, 1234, 1567]. Both noted that plaintiff had chronic, severe pain, including "deep, achy, daily, extremely debilitating" pain that made her "very limited in her abilities to complete [activities of daily living]" [AR 1228, 1234-1235, 1563, 1567-1568], and that plaintiff's pain and subjective symptoms were severe enough to "constantly" interfere with attention and concentration. [AR 1228, 1236, 1569]. They agreed that

---

[2] Fibromyalgia is

> a rheumatic disease that causes inflammation of the fibrous connective tissue components of muscles, tendons, ligaments, and other tissue. Common symptoms . . . include chronic pain throughout the body, multiple tender points, fatigue, stiffness, and a pattern of sleep disturbance that can exacerbate the cycle of pain and fatigue associated with this disease. Fibromyalgia's cause is unknown, there is no cure, and it is poorly-understood within much of the medical community. The disease is diagnosed entirely on the basis of patients' reports of pain and other symptoms. The American College of Rheumatology issued a set of agreed-upon diagnostic criteria in 1990, but to date there are no laboratory tests to confirm the diagnosis.

Benecke v. Barnhart, 379 F.3d 587, 589-590 (9th Cir. 2004) (internal citations omitted).

1 she was not a malinger, and that she was likely to be absent from work as a result of her impairments
2 or treatment more than three times a month.[AR 1226-1240, 1561-1573]. They agreed that the
3 symptoms and functional limitations they assessed had been present at least since 2008. [AR 1226,
4 1237, 1240, 1561, 1569, 1573].

5       The ALJ rejected the three opinions from Dr. Starr and Dr. Pang that she discussed. She did
6 not obtain a consultative examination, so there was no consultative examining source opinion in the
7 record. To support her finding of nondisability, the ALJ relied on the contrary opinion of the
8 nonexamining medical expert, Irvin Belzer, M.D., who was a board-certified internist and
9 pulmonary specialist. [See AR 21-22, 225-226].

10       In general, "[t]he opinions of treating doctors should be given more weight than the opinions
11 of doctors who do not treat the claimant." Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007) (citing
12 Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998)); see Tonapetyan v. Halter, 242 F.3d 1144,
13 1148 (9th Cir. 2001). A treating physician's opinion is entitled to greater weight than those of
14 examining or non-examining physicians because "treating physicians are employed to cure and thus
15 have a greater opportunity to know and observe the patient as an individual . . . ." Edlund v.
16 Massanari, 253 F.3d 1152, 1157 (9th Cir. 2001) (quoting Smolen v. Chater, 80 F.3d 1273, 1285 (9th
17 Cir. 1996) and citing Social Security Ruling ("SSR") 96-2p, 1996 WL 374188); see 20 C.F.R. §§
18 404.1502, 404.1527(c)(2), 416.902, 416.927(c)(2). When a treating physician's medical opinion as
19 to the nature and severity of an individual's impairment is well-supported and not inconsistent with
20 other substantial evidence in the record, that opinion must be given controlling weight. Orn, 495
21 F.3d at 631-632;Edlund, 253 F.3d at 1157; Social Security Ruling ("SSR") 96-2p, 1996 WL 374188,
22 at *1-*2.

23       If a treating source opinion is uncontroverted, the ALJ must provide clear and convincing
24 reasons, supported by substantial evidence in the record, for rejecting it. If contradicted by that of
25 another doctor, a treating or examining source opinion may be rejected for specific and legitimate
26 reasons that are based on substantial evidence in the record. Orn, 495 F.3d at 632; Tonapetyan, 242
27 F.3d at 1148-1149; Lester v. Chater, 81 F.3d 821, 830-831 (9th Cir. 1995).

28       The ALJ gave similar reasons for rejecting the opinions of Dr. Starr and Dr. Pang. The ALJ

found that their opinions are not well-supported and do not correlate with objective findings, clinical observations, or with the "generally normal" physical examination findings in those physicians' treatment notes. [AR 19, 21]. The ALJ did not cite to any specific evidence in the record to buttress her conclusion that the opinions of Dr. Starr and Dr. Pang were inconsistent with other substantial medical evidence in the record. The ALJ did, however, summarize treatment records from 2011 through 2013 which, she concluded, resulted in improvement in plaintiff's condition. That evidence does not provide substantial evidence for her rejection of the opinions of Drs. Starr and Pang concerning the period before 2011.[3]

Furthermore, the ALJ overgeneralizes the findings in those records and mischaracterizes their significance regarding plaintiff's condition between 2011 and March 2013, when the hearing was conducted. For example, the ALJ noted that plaintiff's treatment records indicated that Botox injections had been "helpful" for plaintiff's chronic migraine headaches, "with treating neurologist Jack Florin, M.D. indicating that after a Botox injection on June 19, 2012, [plaintiff] had only 12 migraines in the previous six weeks. At that time, Dr. Florin thus recommended repeat Botox treatments as well as Toradol nasal spray for breakthrough headaches." [AR 19-20 (citing AR 1392, 1400)]. Dr. Florin, however, did not say that plaintiff had "only" 12 migraine headaches in 6 weeks. He compared plaintiff's incidence of 12 migraines in 6 weeks after receiving Botox injections in June 2012 to her prior history of "30 out of 30 headache days" for a period of "5 years, probably 8 years." [AR 1394]. Dr. Florin's treatment records reflect that he previously had

---

[3] The ALJ summarized and discussed only the evidence of record submitted after issuance of her previous decision on December 20, 2010; that evidence is found at AR 1390-1588. The ALJ said that she was "incorporating by reference" the "discussion, analysis, and findings" in her prior decision with which the "Appeals Council found no fault." [AR 17]. The ALJ's attempt to incorporate into her written hearing decision unspecified portions her prior decision by reference necessarily fails. The Appeals Council vacated that decision in its entirety because the record lacked substantial evidence supporting the ALJ's "action, findings or conclusions" under 20 C.F.R. § 404.970, and therefore it "found fault" with the decision as a whole. [See AR 103-104]. While the Appeals Council gave the ALJ some specific instructions about steps she needed to take on remand, it did not exempt any of her findings or conclusions from its order vacating and remanding the matter. Accordingly, it is not accurate to say that the Appeals Council found no fault with portions or her prior decision, nor can this court look back to the prior decision, which is not before the court for purposes of judicial review.

administered Botox injections in November 2011 with "poor response" [AR 1397] and in March 2012 with a "significant response," which he described as a one-third reduction in headache hours and a one-half reduction in headache intensity. [See AR 1395]. Dr. Florin remarked that Botox injections had enabled plaintiff to reduce her use of Norco, an opioid analgesic, to "1 or 2 a day from 3 to 4 a day. Toradol injection at urgent care helped for breakthrough migraine." [AR 1392]. Dr. Florin, who was board-certified in neurology, headache medicine, and clinical neurophysiology, also noted that plaintiff had "failed" the following "preventative" or "abortive" medications: nadolol, Topamax, verapamil, gabapentin, Cymbalta, Lyrica, Savella, Maxalt, Imitrex, and Norco. [AR 1392, 1394]. His diagnoses were chronic migraine and fibromyalgia. He noted that "[g]iven the intractability of [plaintiff's] headaches and only partial control," he was prescribing Toradol nasal spray and keeping plaintiff on her other current medications (Lyrica and naldolol) despite their limited efficacy and documented adverse effects, including tachycardia. [AR 1392; see AR 1395-1397, 1400]. In other words, as of July 2012, after trials of ten different medications and three administrations of Botox injections by a highly-trained specialist, plaintiff had only recently shown a significant response to treatment, and even then she was still getting migraines twice a week, still taking a narcotic pain reliever once or twice a day, and still needed treatment at urgent care for breakthrough headache pain. As the ALJ herself acknowledged, December 2012 treatment reports "indicated that Botox injections were becoming somewhat less effective." [AR 20, 1523]. Dr. Florin "requested authorization for occipital and trigeminal nerve blocks," while also advising Dr. Starr to consider "experimental treatments for migraine, with the current main prospect magnetic stimulation." [AR 20, 1523]. In January 2013, Dr. Florin wrote to Dr. Starr that plaintiff's current diagnoses were "[c]hronic migraine with probable opioid medication-overuse headaches, intractable and failing Botox," and "[f]ibromyalgia, not well controlled despite Savella, Lyrica, and Norco." [AR 1589]. Dr. Florin added that he had administered bilateral greater occipital nerve blocks and trigeminal nerve blocks, and that since plaintiff "[p]reviously failed Topamax, Cymbalta, gabapentin, and treatment at the St. Jude Pain Management Center," he would "make no change in medications," but would follow up with plaintiff regarding the effects of the nerve blocks. [AR1589]. He also commented that "[m]anagement is obviously very difficult, and there are no

other chronic migraine treatments that I have not tried." [AR 1589].

Shortly thereafter, plaintiff underwent cervical spine x-rays. Dr. Starr remarked that "new findings of significant cervical disc disease combined with [plaintiff's] underlying chronic fibromyalgia pain syndrome" warranted "further evaluation" with a cervical spine MRI, which was performed on March 13, 2013. [AR 1576-1582, 1591-1592]. The MRI report stated that overall, plaintiff had moderate multilevel degenerative changes; multiple levels of spinal canal narrowing were noted with mild compression of the spinal cord at C4-C5 and C5-C6, a "tiny" C5-C6 disc protrusion, and neural foraminal stenosis at C4-C5 and C5-C6. [AR 1591-1592]. After the MRI was taken, Dr. Starr referred plaintiff to Raed Ali, M.D., for an orthopedic evaluation of neck pain radiating into plaintiff's bilateral shoulders, arms, and hands that plaintiff rated 6 to 9 out of 10 in severity. [AR 1596]. Dr. Ali noted "gross upper and lower extremity sensory and motor exam significant for bilateral grip strength weakness, left grip strength diminished compared to right, and she is left hand dominant," "positive Phalen's sign in the bilateral upper extremities consistent with carpal tunnel syndrome," negative Tinel's sign at the wrist and elbow, negative Hoffman's sign, and intact bilateral lower extremity gross sensory and motor exam with mild lower extremity pain complaints. Dr. Ali recommended a trial of a cervical midline epidural steroid and further follow-up. [AR 1596-1600].

While undergoing treatment with Dr. Florin, plaintiff saw Dr. Starr and Dr. Pang regularly for follow-up, and their progress reports are consistent with Dr. Florin's reports in documenting plaintiff's ongoing signs and symptoms of chronic headaches and fibromyalgia, as well as her variable response to Botox injections and other treatment from 2011 through March 2013. [See, e.g., AR 1420, 1433-1431, 1442, 1445, 1465-1467, 1576-1588].

Substantial evidence does not support the ALJ's conclusion that the treating source records she summarized were inconsistent with the opinions of Dr. Starr and Dr. Pang and failed to document supporting objective findings or clinical observations. Although plaintiff's treatment records document some intermittent improvement in her symptoms in response to Botox injections, they also establish that any improvement was transient; that objective and clinical findings existed to support the conclusions of Dr. Starr and Dr. Pang; that extensive, even exhaustive, attempts were

made to treat her chronic headaches and fibromyalgia; and that treating physicians who had a "detailed, longitudinal" knowledge of her condition, including both her long-term primary care physician and her treating specialists, credited her subjective symptoms and concluded that her chronic headaches were intractable and her fibromyalgia was uncontrolled despite her long history of extensive treatment for those and other conditions. See Benecke v. Barnhart, 379 F.3d 587, 590-592, 594 (9th Cir. 2004) (holding that the ALJ erred in rejecting the opinions of the claimant's treating physicians by "effectively requiring objective evidence for a disease that eludes such measurement" where the claimant had an extensive history of severe, persistent pain and other symptoms, had seen numerous specialists, and had undergone an array of unsuccessful treatments; all three treating physicians in rheumatology, the relevant specialty, diagnosed and treated the claimant for fibromyalgia; and two of the treating rheumatologists opined that the claimant was unable to work); see also 20 C.F.R. §§ 404.1527(c), 416.927(c) (explaining that treating source opinions are given more weight because those sources are likely to be most able to provide a "detailed, longitudinal picture" of the claimant's medical impairments, and explaining that the length, frequency, nature and extent of treatment and area of specialization are among the factors weighed in evaluating treating source opinions); SSR 12-2p, 2012 WL 3017612, at *2-*3 (explaining the American College of Rheumatology diagnostic criteria for fibromyalgia ("FM"), and explaining that "[w]hen a person alleges FM, longitudinal records reflecting ongoing medical evaluation and treatment from acceptable medical sources are especially helpful in establishing both the existence and severity of the impairment").[4]

On this record, the ALJ erred in rejecting the treating source opinions of Dr. Starr and Dr. Pang, a rheumatologist, in favor of the contrary opinion of Dr. Belzer, who is not a rheumatologist and whose nonexamining source opinion is not based on "independent clinical findings." See Orn,

---

[4] SSR 12–2p "designates two separate sets of diagnostic criteria that can establish fibromyalgia as a medically determinable impairment. These criteria [were] published by the American College of Rheumatology in 1990 and 2010 . . . ." Rounds v. Comm'r Soc. Sec. Admin., 807 F.3d 996, 1005 (9th Cir. 2015). "[I]n contrast to the 1990 criteria, the 2010 diagnostic criteria do not require a specific number of tender points in specific locations." Rounds, 807 F.3d at 1005 n.10.

- 8 -

495 F.3d at 632 (stating that when a nontreating physician "relies on the same clinical findings as a treating physician, but differs only in his or her conclusions, the conclusions of the [nontreating] physician are not 'substantial evidence'" contradicting a treating source opinion, and that a nontreating physician must provide "independent clinical findings that differ from the findings of the treating physician" to support a contrary opinion). "Independent clinical findings can be either (1) diagnoses that differ from those offered by another physician and that are supported by substantial evidence, or (2) findings based on objective medical tests that the treating physician has not herself considered." Orn, 495 F.3d at 632 ( (internal citations omitted). Dr. Belzer's diagnoses of chronic migraine or "tension-type" headaches and fibroymyalgia [AR 40-41] did not differ from the treating source diagnoses. Additionally, Dr. Belzer did not base his opinion on objective medical tests or clinical findings that were not considered by Dr. Starr or Dr. Pang; he simply interpreted the same evidence differently. [See AR 48-49[5]]. Since Dr. Belzer did not base his contrary opinion on independent clinical findings, his opinion cannot constitute substantial evidence supporting the ALJ's decision, particularly where, as here, the record includes a treating rheumatologist's uncontroverted diagnosis of fibromyalgia. See Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1107 (9th Cir. 2014) ("Benecke implicitly held that the conclusions of the non-treating and non-examining physicians did not create a factual issue that required resolution by the agency where the rheumatologists who treated the claimant (and whose views were entitled to more weight) unanimously concluded she suffered from fibromyalgia.") (citing Benecke, 379 F.3d at 594 & n. 4 ("Each rheumatologist's opinion is given greater weight than those of the other physicians because it is an 'opinion of a specialist about medical issues related to his or her area of specialty.'") (citing 20 C.F.R. § 404.1527(d)(5)).

The opinions of Dr. Starr, plaintiff's treating primary care physician, and Dr. Pang, her treating rheumatologist, as to the nature and severity of plaintiff's impairments are well-supported and are not contradicted by substantial evidence in the record. Therefore, those opinions are entitled

---

[5] Dr. Belzer did not contradict the functional assessments of Drs. Starr and Pang in at least one respect. Specifically, Dr. Belzer testified that the frequency of plaintiff's headaches in 2008 and 2009 "certainly" could have resulted in her missing work three days a month. [AR 49].

to controlling weight. See Orn, 495 F.3d at 631-632; Edlund, 253 F.3d at 1157.

The Commissioner does not dispute that if the treating source opinions are credited, they establish disabling work-related functional limitations. [See JS 26]. Plaintiff's date last insured for disability insurance purposes was December 31, 2013, and the medical record is fully developed as to plaintiff's treatment prior to her date last insured. There is no medical opinion evidence in the record on which the ALJ could properly rely to find plaintiff not disabled between her alleged onset date and her date last insured. Therefore, this case, like Benecke, is "the unusual case in which it is clear from the record that the claimant is unable to perform gainful employment in the national economy, even though [a] vocational expert did not address the precise work limitations established by the improperly discredited testimony, and remand for an immediate award of benefits is appropriate." Benecke, 379 F.3d at 595.

This conclusion makes it unnecessary to reach plaintiff's remaining contentions; however, at least some of those contentions have merit. Plaintiff contends that the ALJ did not make a properly supported credibility finding and failed properly to consider the number and side effects of her prescribed medications. [JS 9-20].

The ALJ found that plaintiff's ability to walk her dog, work on her computer, read, crochet, and perform unspecified "other activities" for "extended periods of time . . . suggest[s] an ability to perform work-related activities." [AR 19]. The ALJ may discredit a claimant's subjective testimony "when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting. Even where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment." Molina v. Astrue, 674 F.3d 1104, 1112-1113 (9th Cir. 2012) (internal quotation marks and citations omitted). However, the Ninth Circuit has "repeatedly warned that ALJs must be especially cautious in concluding that daily activities are inconsistent with testimony about pain, because impairments that would unquestionably preclude work and all the pressures of a workplace environment will often be consistent with doing more than merely resting in bed all day." Garrison v. Colvin, 759 F.3d 995, 1015-1016 (9th Cir. 2014) (holding that the ALJ erred in concluding that the plaintiff's reported daily activities, which "included talking on the

phone, preparing meals, cleaning her room, and helping to care for her daughter," were inconsistent with her pain complaints). Plaintiff's testimony does not suggest that she devoted a substantial portion of her day performing activities that could be transferred to a work setting or whose performance was inconsistent with the alleged severity of her subjective symptoms. At most, she reported limited or sporadic performance of a restricted range of basic daily activities. [See AR 33-40, 62-66]. See Benecke, 379 F.3d at 594 (holding that the ALJ erred in relying on the claimant's "ability to carry out certain routine tasks" to discount the credibility of her subjective symptoms where the claimant's "daily activities are quite limited and carried out with difficulty. This court has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities does not in any way detract from her credibility as to her overall disability. One does not need to be utterly incapacitated in order to be disabled.") (internal quotation marks and ellipsis omitted). Moreover, plaintiff's treating physicians, who saw her frequently over a period of years, credited her subjective symptoms, as reflected in their progress reports, functional assessments, and in their persistent attempts to give her relief through trials of many different medications and other treatments, referrals to specialists, and diagnostic testing).

The ALJ also failed adequately to consider the nature and effects of plaintiff's prescribed medications. See SSR 96-7p, 1996 WL 374186, at *3 (explaining that ALJs must consider "[t]he type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms"); Erickson v. Shalala, 9 F.3d 813, 817 (9th Cir. 1993) (stating that the ALJ must consider all factors that might have a "significant impact on an individual's ability to work," including "side effects of medications"). The record indicates that plaintiff was taking between 13 and 16 medications at or around the time of the hearing. [AR 346-347, 1576-1577]. On cross-examination by plaintiff's counsel, Dr. Belzer testified that he "did not realize at any one time she was taking 16 different medications." [AR 50]. Dr. Belzer also testified that "the vast majority of medicines that are used to treat headaches do cause tiredness, fatigue, lethargy, . . . inability to focus to some degree or another." [AR 51].

Plaintiff testified that she did not feel safe driving due to her pain medication so her husband drove her most places. [AR 35]. She testified that "every single medication I take has a side effect

of headaches," but that if she stopped taking them she had "extreme pain." [AR 37]. She also testified that she wore braces on her arm at night because one of her medications, Lyrica, caused pain in her arm. [AR 39]. The treatment records contain numerous references to side effects from plaintiff's medications. [See, e.g., AR 1395 (complaints of forgetfulness and lightheadedness with increasing Lyrica); AR 1397 (noting that Lyrica seemed to cause flare-up of plaintiff's left carpal tunnel syndrome); AR 1400 (noting that Cymbalta dose was reduced due to tachycardia, with worsening pain and no improvement in tachycardia; "[p]reviously, Cymbalta and Lyrica failed because of adverse effects"); AR 1403 (plaintiff complained of mood changes, more headaches and other side effects after starting gabapentin); AR 1469 (noting tachycardia secondary to Savella); AR 1477 (noting that gabapentin causes multiple side effects)]. The ALJ's failure to consider the evidence regarding side effects from plaintiff's medications in assessing the credibility of her subjective testimony and her RFC was error.

Since the ALJ improperly rejected treating source opinions that are entitled to controlling weight and the record is fully developed, a remand for further proceedings in this case would serve "no useful purpose and is unwarranted." Benecke, 379 F.3d at 596. Accordingly, a remand for an award of benefits is the appropriate remedy. See Schneider v. Colvin, 2015 WL 6081765, at *5 (E.D. Cal. Oct. 14, 2015) (remanding for an award of benefits and holding that no useful purpose would be served by remanding for further administrative proceedings because "[a] retrospective opinion by a reviewing physician" concerning the plaintiff's six-year old medical records would not be relevant, "a current examination or consultation will not have any bearing" in determining the plaintiff's ability to work during a prior three-year period, the "opinion and treating records of" the plaintiff's "long-time treating psychiatrist" were in the record and were "the best evidence of" the plaintiff's condition" during the relevant period, and the treating source opinion had been credited as true).

The Commissioner contends that since the ALJ issued the agency's final decision on April 11, 2013, more than three years before the date of this decision, remanding for an award of benefits amounts to "making a finding of disability that covers a period beyond that adjudicated by the agency." [JS 32 (citing Hearings, Appeals and Litigation Law Manual I-2-8-18A, 1993 WL

1    643058)]. That contention lacks merit.

2    This court's jurisdiction is limited to reviewing the Commissioner's final decision denying
3    benefits and finding plaintiff not disabled through April 11, 2013. Accordingly, the Court's decision
4    concerns plaintiff's entitlement to benefits from plaintiff's alleged onset date through April 11, 2013.
5    Under Ninth Circuit law, however, that "once a claimant has been found disabled, a presumption
6    of continuing disability arises in [her] favor." Parra v. Astrue, 481 F.3d 742, 748 (9th Cir. 2007)
7    (italics and brackets omitted) (quoting Bellamy v. Sec'y of Health & Human Servs., 755 F.2d 1380,
8    1381 (9th Cir. 1985)); see Murray v. Heckler, 722 F.2d 499, 500 (9th Cir. 1983). The presumption
9    shifts the burden of production to the Commissioner to produce evidence sufficient to rebut the
10   presumption. Bellamy, 755 F.2d at 1381; Murray, 722 F.2d at 500; Mendoza v. Barnhart, 436 F.
11   Supp. 2d 1110, 1113 (C.D. Cal. 2006); see also Medina v. Colvin, 2015 WL 5448498, at *9 (N.D.
12   Cal. Aug. 21, 2015) (examining the development of Ninth Circuit law on the issue of the
13   presumption of continuing disability, concluding that the presumption remains good law, and
14   applying it); Osbispo v. Colvin, 2015 WL 5705610, at *6 (C.D. Cal. Sept. 28, 2015) (applying the
15   presumption); Palacios v. Astrue, 2012 WL 601874, at *1 (C.D. Cal. Feb. 23, 2012) (noting that
16   "the claimant retains the burden of persuasion," but that the presumption of continuing disability
17   shifts the burden of production to the Commissioner). Since plaintiff is entitled to a presumption
18   of continuing disability after the date of the ALJ's decision, the fact that she may receive benefits
19   for that period without adjudication of her entitlement after April 11, 2013 does not undermine the
20   validity of this Court's decision to order an award of benefits.

21   Moreover, the Commissioner is not without statutory and regulatory authority to address the
22   issue of plaintiff's eligibility for benefits after April 11, 2013. When disability insurance benefits
23   or supplemental security income benefits are awarded, the Commissioner is required and authorized
24   to periodically review the recipient's continuing eligibility for such benefits, which may be
25   terminated if "the physical or mental impairments on the basis of which such benefits are provided
26   has ceased, does not exist, or is not disabling . . . ." 42 U.S.C. §§ 423(f), 1382c(a)(4); see 42 U.S.C.
27   §§ 421(i); 20 C.F.R. §§ 404.1589, 404.1590, 416.989, 416.990; Sandoval v. Colvin, 2014 WL
28   4854565, at *1 n.2 (C.D. Cal. Sept. 30, 2014) ("When a claimant has been granted benefits, the SSA

1  evaluates her impairment(s) from time to time to determine if she is still eligible for disability cash
2  benefits. These recurring evaluations are called continuing disability reviews because a presumption
3  of continuing disability arises once a claimant has been identified as disabled [and] the
4  Commissioner has the burden of producing evidence to meet or rebut the presumption.") (internal
5  quotation marks, brackets, and citations omitted); see also Schneider, 2015 WL 6081765, at *5 n.3
6  ("[A]nytime a reviewing court reverses an ALJ's disability determination and awards benefits, the
7  claimant is deemed disabled until a subsequent review of the disability determination pursuant to
8  20 C.F.R. §§ 404.1590(d), 416.990(d)."). If the Commissioner determines that a recipient was paid
9  benefits to which he or she was not entitled, the Commissioner may seek recovery of overpayment.
10 See 42 U.S.C. §§ 404(b), 1383(b).

11 Where a claimant is found eligible for disability benefits on the basis of a decision by an
12 ALJ, the Appeals Council, "or a Federal court," the Commissioner "will not conduct a continuing
13 disability review earlier than 3 years after that decision unless [the] case should be scheduled for a
14 medical improvement expected or vocational reexamination diary review or a question of continuing
15 disability is raised pursuant to paragraph (b) of this section." 20 C.F.R. § 404.1590(f). In other
16 words, under the Commissioner's own regulations, the mere passage of up to three years' time after
17 a decision awarding benefits is not even sufficient to trigger a continuing disability review, much
18 less to call into question the recipient's substantive entitlement to benefits. Although the
19 Commissioner's contention in this case concerns a three-year period that followed the ALJ's *denial*
20 of benefits and that preceded rather than followed this decision, her regulations belie her assertion
21 that benefits should not be awarded merely because roughly three years have passed since the most
22 recent date on which plaintiff was adjudicated disabled. The Commissioner is free to conduct a
23 continuing disability review regarding plaintiff's entitlement to benefits after April 11, 2013 if
24 warranted under her regulations.

25 ///
26 ///
27 ///
28 ///

**Conclusion**

For the reasons stated above, the Commissioner's decision is **reversed**, and the matter is **remanded to the Commissioner for an award of benefits.**

**IT IS SO ORDERED.**

May 3, 2016

_____
ANDREW J. WISTRICH
United States Magistrate Judge